UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ARCHARD LEE MASON,                          Civil Action No. 15-14300


        Plaintiff,                          HON. NANCY G. EDMUNDS
                                            U.S. District Judge
v.                                          HON. R.  STEVEN WHALEN
                                            U.S. Magistrate Judge

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Archard Lee Mason ("Plaintiff") brings this action under 42 U.S.C. §405(g),

challenging a final decision of Defendant Commissioner denying his application for

Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed

summary judgment motions which have been referred for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below I recommend that

Defendant's motion [Doc. #15] be GRANTED and that Plaintiff's motion [Doc. #12] be

DENIED.[1]

_____

        [1]The Docket shows that Plaintiff submitted two apparently identical motions for
summary judgment.  *Docket #11-12.*

## PROCEDURAL HISTORY

On January 9, 2016, Plaintiff filed an application for DIB, alleging disability as of April 21, 2007 (Tr. 144-147). After the initial denial of the claim, he requested an administrative hearing, held on June 2, 2014 in Oak Park, Michigan before Administrative Law Judge ("ALJ") Gregory Holiday (Tr. 29). Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 38-68), as did Vocational Expert ("VE") Pauline Pegram (Tr. 68-77). On July 15, 2014, ALJ Holiday found Plaintiff not disabled (Tr. 13-31). On October 28, 2015, the Appeals Council denied review (Tr. 1-5). Plaintiff filed for judicial review of the Commissioner's decision on December 10, 2016.

## BACKGROUND FACTS

Plaintiff, born March 2, 1964, was 50 when the ALJ issued his decision (Tr. 31, 144). He completed three years of college and received truck driver training (Tr. 182). He worked previously as a "casual worker" for the U.S. Postal Service, filing clerk, fueler, janitor, and press operator (Tr. 182). His application for benefits alleges disability as a result of post traumatic stress disorder ("PTSD"), bone degeneration, and arthritis (Tr. 181).

### A.     Plaintiff's Testimony

 Plaintiff offered the following testimony:

 He had recently lost 15 pounds due to decreased appetite (Tr. 38). He had not worked since April, 2007 (Tr. 39). Statements from 2010 showing $10,600.00 self-employment earnings were attributable to a government stipend given to him while he was attending

school to become a surgical technician (Tr. 39).  During a portion of time since the alleged onset of disability, he had worked as a jitney driver (Tr. 40).  The work involved mostly driving individuals to appointments and the grocery store but sometimes required him to carry groceries (Tr. 40).

Plaintiff took care of his personal needs (Tr. 41).  He lived in a duplex but had not cut the grass since 2010 (Tr. 42).  He did not shop for groceries more than once every three months but was able to drive and take a bus (Tr. 42).  He sometimes experienced physical problems getting on and off the bus and/or determining the correct route to his destination (Tr. 43-44).  He took the bus and did errands early in the morning because he experienced stress from being in large groups due to PTSD (Tr. 44).  He drove to church approximately twice a month (Tr. 45).

Plaintiff was left-handed, had an email account, and was able to use a computer (Tr. 45).  He did not have a social networking account and did not use credit or debit cards (Tr. 46).  He had a cell phone but did not text (Tr. 46).  He had two adult children but did not see them very often (Tr. 46).  He had not used alcohol and marijuana since the alleged onset of disability and never used cocaine (Tr. 47-48).  Plaintiff required correction for closeup vision but did not wear glasses (Tr. 48).  He watched television occasionally but was "not a real big television fanatic" (Tr. 48).  He tried to avoid watching the news (Tr. 49).  He did not watch sports or movies but was able to visit with friends (Tr. 49).  He did not have a girlfriend (Tr. 49).

-3-

Plaintiff was unable to carry more than 10 pounds, stand for more than 10 minutes, or sit for more than five (Tr. 50). He took pain medication but had not taken it the morning of the hearing because he drove himself to the hearing (Tr. 51). He currently took antidepressants and Hydrocodone for body pain (Tr. 52). He had been taking the same combination for four years (Tr. 52). He currently took shots for his shoulder condition (Tr. 52). He experienced finger inflamation (Tr. 52). He saw a dermatologist for the finger condition (Tr. 52). Plaintiff was unable to squat to the floor but could squat "half-way" (Tr. 53). He required the use of a cane, which he used for balance problems (Tr. 53-54). He went to a Department of Veterans Affairs ("VA") hospital for medical treatment (Tr. 53). He "played music" as a hobby (Tr. 55).

In response to questioning by his attorney, Plaintiff reported difficulties sleeping, despite the use of sleep medication (Tr. 55-56). He took 10 to 15-minute naps up to three times a day (Tr. 56). In addition to the naps, Plaintiff periodically lay on his stomach during the day to relieve back and knee pain (Tr. 57). He testified that arthritis of the neck and shoulder spurs were his worst physical problems (Tr. 57). He experienced limitations in neck motion due to "stiffness" (Tr. 57). He took muscle relaxers twice a day from which he experienced the side effect of loose bowels (Tr. 58). He described his knee condition as "bone on bone grinding" and "stiffness" (Tr. 59). He achieved significant relief of shoulder pain from steroid injections (Tr. 59-60). He took Hydrocondone and Naproxen once a day and Gabapentin for body pain (Tr. 60-61). He experienced the side of effect of seeing

-4-

"spots" or the belief that someone else was in the room with him (Tr. 61). In response to his report of side effects, his psychiatrist had increased his dosage of psychotropic medication (Tr. 62). His psychological symptoms included depression and the inability to express himself (Tr. 62). He did not experience problems interacting in retail situations because he was not there "long enough" to encounter problems and did not have problems volunteering at church because there were "more people [he was] familiar with" (Tr. 63).

In response to questioning by his attorney, Plaintiff stated that his psychotropic medications kept him from feeling suicidal (Tr. 63). He testified that he no longer took trips and did not interact with friends or family as often as he used to (Tr. 63). He stated that in the previous month, he took a bus trip requiring a transfer, but had to get off early because he "couldn't stand the crowdedness" (Tr. 64). He was unable to keep focus on crime investigation shows for even half an hour before becoming upset at the storyline related to the apprehension of criminals (Tr. 64). He was unable to play music for more than three minutes without losing focus due to his short attention span (Tr. 65). He sometimes forgot where he was going and required reminders to keep appointments (Tr. 65). He was not able to hold a conversation and did not enjoy being around people (Tr. 66). His most comfortable position was sitting upright with his legs elevated (Tr. 66).

*The ALJ then resumed his questioning*:

Plaintiff customarily drove to his appointments at the VA hospital (Tr. 66). He was able to buy gas for his car (Tr. 67). At the time he took a bus transfer route the previous

-5-

month, he was on his way to a store to buy himself t-shirts (Tr. 67).  He took the bus because his car had broken down (Tr. 67).  If his car had not been broken, he would have driven to the store (Tr. 67).

### B.    Medical Evidence[2]

### 1. Treating Records

A treatment summary by the VA shows a diagnoses of PTSD in February, 2005, moderate depression/September, 2005, lumbar disc degeneration/ September, 2010, cervical spinal stenosis/July, 2011, and shoulder pain/September, 2012 (Tr. 233-234, 237).

In August, 2006, Plaintiff reported "multiple stressors caring for his [ailing] mother and trying to maintain his home" (Tr. 660).  October, 2006 VA records state that Plaintiff was working full time as a night janitor but had "multiple conflicts with others" (Tr. 646). In August, 2007, Plaintiff reported sleep disruption after running out of depression medicine (Tr. 626).  Treating records from March, 2009 state that Plaintiff was deployed to Iraq in early 2003 and discharged in December, 2003 (Tr. 248).  He reported that he experienced behavioral problems after being discharged and lost two jobs in quick succession (Tr. 249). He reported severe depression, low energy, and flashbacks of his time in Iraq (Tr. 249).  He denied psychiatric hospitalizations (Tr. 249).  He reported that his current classes helped him focus, but did not improve his life otherwise (Tr. 249).  He opined that he would experience

[2]Evidence significantly predating the alleged onset of disability date of April 21, 2007, where discussed, is included for background purposes only.

-6-

difficulty doing an internship due to his unpredictable behavior and problems with authority figures (Tr. 250). He alleged chronic fatigue but was nonetheless able to perform daily activities (Tr. 252). He was found to be competent to handle his VA funds and not required to undergo psychological testing (Tr. 251). A physical examination was unremarkable (Tr. 252-253).

In February, 2009, Plaintiff denied mental health problems (Tr. 619). June, 2009 records state that Plaintiff had been "kicked out" of his mother's house by other family members and since then, had been living either with friends or in his truck (Tr. 604). August, 2009 treating records note that Plaintiff was depressed (Tr. 524). December, 2009 records related to a inguinal hernia repair procedure note that surgery scheduled for August, 2009 was postponed because Plaintiff was then homeless (Tr. 506). June, 2010 records state that Plaintiff was employed and undergoing training to be a surgical technician (Tr. 575). September, 2010 and March, 2012 x-rays of the right knee showed only mild degenerative changes (Tr. 224, 232). Plaintiff moved into a rental home in August, 2010 after receiving a HUD housing voucher (Tr. 547). The following month, he reported right shoulder pain and hand numbness (Tr. 555).

An October, 2010 MRI of the lumbar spine showed moderate disc protrusions at L3-L4 and L5-S1, and nerve root encroachment at L4-L5 (Tr. 231). The same month, an MRI of the cervical spine showed mild encroachment at C6-C7 (Tr. 229-230). An MRI of the brain was unremarkable (Tr. 330-331). Imaging studies of the right shoulder performed in

October, 2010 and June, 2011 were consistent with rotator cuff tendinosis (Tr. 225, 228, 327). A December, 2010 chest x-ray was unremarkable (Tr. 227, 328). The same month, Plaintiff reported audio hallucinations (Tr. 518). He was assigned a GAF of 50[3] (Tr. 518). February, 2011 bilateral imaging studies of the knees showed only mild degenerative changes (Tr. 226). Notes from the same month note depressive and psychotic disorders, unemployment, and social isolation (Tr. 445). The following month, Plaintiff reported that he was "employed . . ., in school and ha[d] hobbies" (Tr. 429). In April, 2011, Plaintiff declined treatment despite reporting depression (Tr. 416). He denied hallucinations on one occasion and admitted to them on another (Tr. 416, 418). He appeared fully oriented (Tr. 416). Treating notes from the same month state that Plaintiff had a normal gait but reduced range of right shoulder motion (Tr. 427). In September, 2011, Plaintiff was informed that he was no longer receiving HUD benefits due to an increase in his income due to a 100 percent VA disability award (Tr. 406, 434). Plaintiff restarted his psychotropic medications in November, 2011, reporting that things were "real hazy" without medication (Tr. 314, 387). He presented with a constricted affect and depressed mood (Tr. 315). He denied suicidal or violent ideation (Tr. 315).

January, 2012 myelopathy testing was negative (Tr. 268). March, 2012 imaging

---

[3]A GAF score of 41-50 indicates '[s]erious symptoms...[or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* ("*DSM-IV-TR*"), 34 (4th ed. 2000).

studies of the lumbar spine showed no recent changes (Tr. 223). Imaging studies of the right shoulder were likewise unchanged (Tr. 298). Plaintiff reported that watching the "TV news" triggered anxiety (Tr. 301). He reported good results from steroid injections to the shoulder (Tr. 304). Imaging studies of the lumbar spine and right knee were essentially unchanged from earlier studies (Tr. 325-326). A physical examination revealed full muscle strength and a normal gait (Tr. 305-306). March, 2012 records note a normal right shoulder x-ray (Tr. 324). In May, 2012, Plaintiff reported good results from his current psychotropic medication (Tr. 380). A June, 2012 ultrasound of the lower extremities was negative for deep venous thrombus (Tr. 285, 373). The same month, Plaintiff was administered steroid injections to the right knee and shoulder (Tr. 286, 317). He appeared alert, oriented, and in no acute distress (Tr. 288). He reported that he was happy with his current medication regimen (Tr. 293, 364). He described himself as "quite busy" and was not interested in "any kind of counseling" (Tr. 293). He was assigned a GAF of 65[4] (Tr. 295, 382).

September, 2012 steroid injections to the left shoulder and right knee were performed without complications (Tr. 267). Treating records note normal muscle bulk and tone and 5/5 strength (Tr. 269, 360). Plaintiff reported good results from the injections (Tr. 271). He was advised to take "fall precautions" and avoid heights (Tr. 360). He continued to take psychotropic medication to keep symptoms of PTSD in check (Tr. 276). He reported

---

[4]GAF scores in the range of 61–70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR*.

attending church once a week (Tr. 276).   In December, 2012, Plaintiff received steroid injections to the right knee and shoulder without complications (Tr. 258).   He rated his shoulder pain as an eight out of ten and knee, nine out of ten (Tr. 259).   He reported feeling isolated living by himself (Tr. 260, 354).

February, 2013 VA records state that Plaintiff was deemed 100 percent disabled due to PTSD (Tr. 255, 349).   Plaintiff reported good results from psychotropic medication but described himself as isolated (Tr. 255).   He did car repairs and errands during the day (Tr. 255).   He denied medication side effects (Tr. 255).   Plaintiff appeared pleasant with good grooming and hygiene and denied hallucinations (Tr. 256).   April, 2013 records state that Plaintiff kept busy with errands and volunteering at a church-sponsored food drive (Tr. 346). He appeared mildly anxious but denied hallucinations (Tr. 346).   May, 2013 imaging studies of the bilateral shoulders and left knee showed degenerative osteoarthritis (Tr. 326, 342). The following month, Plaintiff appeared alert and oriented with good balance (Tr. 340).   He was prescribed a "single point cane" cane (Tr. 340).   Treating notes state that Plaintiff was able to climb stairs frequently (Tr. 345).

In May, 2014, Wanda Norris, M.D. completed a Medical Assessment of Ability to do Work Related Activities (Mental), finding that Plaintiff followed rules well but had only fair judgment and ability to interact with supervisors and "poor to no[]" ability to deal with work stressors (Tr. 720).   She found that he lacked the ability to understand, remember, and carry out complex tasks and a had only a "fair" ability  to perform simple tasks (Tr. 721).   She

opined that he had "poor to no[]" ability to behave in a stable manner or relate predictably in social settings (Tr. 721). She found that Plaintiff experienced such limitations starting in "approximately" 2009 to 2010 (Tr. 721, 723).

## 2. A Non-Treating Record

In March, 2013, Rose Moten, Ph.D. performed a non-examining assessment of Plaintiff's mental condition, finding that he experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 84). She found he was limited in the ability to understand, remember, and carry out detailed instructions and maintain concentration for extended periods (Tr. 86). She found that he was "best suited for work that does not involve regular contact with coworkers, the public and supervisors" (Tr. 87).

## C.   Vocational Expert Testimony

VE Pauline Pegram classified Plaintiff's past work as a mail handler as semiskilled and exertionally light;[5] driver, semiskilled/medium; cleaner, unskilled/heavy; machine feeder, unskilled/medium; and packager, unskilled/medium (Tr. 69-70). The ALJ then posed the

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

following question to the VE, describing a hypothetical individual of Plaintiff's age,

education and work experience:

> [A]ssume a person . . . who is able to perform at not more than the medium exertional level with the following limitations: Must avoid concentrated exposure to hazards like dangerous machinery, unprotected heights. Must be employed in a low-stress job. I would define that as a job calling for no more than occasional decision making. No more than occasional changes in a work setting. He is limited to no more than brief superficial interactions with the public and with coworkers, and no more than occasional supervision. With those limitations could such a hypothetical person perform [any] of the past jobs of Mr. Mason? (Tr. 66).

The VE replied that given the above limitations, the individual could perform the past work

of machine feeder and packager (Tr. 71). She found that in addition, the individual could

perform the medium, unskilled work of a hand packager (1,500 positions in the State of

Michigan) and cleaner (8,000) (Tr. 71). The ALJ then amended the above limitations:

> [T]his person can perform at not more than the light exertional level, limited to no more than frequent operation of foot controls with the left lower extremity. No more than occasional kneeling . . . no more than frequent crouching . . . 50 percent of the normal. No constant rotation or flexion or extension of the neck, and that is limited to 70 percent of the normal. No more than occasional overhead reaching and handling with the left upper extremity. No more than frequent gross manipulation with the left upper extremity. With those changes, are there past jobs that his hypothetical person could still perform? (Tr. 72).

In response, the VE stated that the additional limitations preclude all past work but

would allow for the light, unskilled work of a cleaner/housekeeper (2,700); and laundry

worker (3,500) (Tr. 73).

The VE testified further that if the same individual also required "a sit/stand option

with the ability to alternate between sitting and standing up to four times per hour," it would eliminate the above-cited exertionally light work but allow for light work as a hand packager (8,000) and hand assembler (8,000) (Tr. 74). The VE stated that the need for a cane would not change the most hand packager or hand assembler numbers (Tr. 74). The VE stated that if Plaintiff were limited to sedentary work, he could perform the sedentary jobs of hand assembler (sedentary) (4,000) and inspector/sorter (2,500) (Tr. 75). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") (Tr. 75).

In response to questioning by Plaintiff's attorney, the VE testified that the need to be off task for more than 10 percent of the workday, or, customarily miss more than one day of work each month was work preclusive (Tr. 76).

### D. The ALJ's Decision

The AL found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of April 21, 2007, noting that while Plaintiff's earnings in 2010 were "consistent with substantial gainful activity" the ALJ would give him "the benefit of the doubt" and proceed with the subsequent steps of the sequential analysis (Tr. 15). Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "right rotator cuff tendinopathy; left shoulder tendinitis; osteoarthritis of the bilateral knees (left worse than right); PTSD []; and dysthymia versus major depressive disorder, severe, recurrent" but that none of the conditions met or medically equaled an impairment listed in

-13-

20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-17).

The ALJ found mild restrictions in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 18-19). The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [M]ust be permitted to alternate between sitting and standing up to four times per hour; no more than frequent operation of foot controls with the left lower extremity; no more than occasional kneeling; no more than frequent crouching (limited to 50 percent of the normal distance); no constant rotation, flexion, or extension of the neck (limited to 70 percent handling with the left upper extremity; no more than frequent gross manipulation with the left upper extremity; must avoid concentrated exposure to hazards, like dangerous machinery, unprotected heights; must be employed in a low stress job, denined as a job calling for no more than occasional decision-making and no more than occasional changes in the work setting; limited to no more than brief, superficial interaction with the public and coworkers; and no more than occasional supervision (Tr. 20).

Citing the VE's testimony (Tr. 74), the ALJ determined that while Plaintiff was unable to perform any of his past relevant work, he could perform the exertionally light work of a hand packager and hand assembler (Tr. 30).

The ALJ discounted Plaintiff's alleged degree of limitation (Tr. 22-28). The ALJ noted that Plaintiff's treatment for the physical ailments had been "routine and/or conservative" (Tr. 22). The ALJ cited fairly unremarkable December, 2010 examination records showing no pain walking and no lower extremity swelling and other records showing full muscle strength in all but the right upper extremity (Tr. 22).

As to the mental conditions, the ALJ noted that Plaintiff's treatment had been

-14-

conservative and that he had taken psychotropic medication sporadically (Tr. 23-24). The ALJ noted that mental status examinations performed even when Plaintiff was not taking psychotropic drugs were unremarkable (Tr. 24). He noted that Plaintiff's mental health condition "improved dramatically" after he restarted the psychotropic medication (Tr. 25-26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884

F.2d 241, 245 (6th Cir. 1989).

## **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff makes a total of six arguments for a remand for further fact-finding. *Plaintiff's Brief, 7-17, Docket #11, Pg ID 779.*  First, he contends that the ALJ violated HALLEX II-1-11-12 by failing to accord "proper weight" to the VA finding that he was 100

percent disabled due to PTSD.[6]  *Plaintiff's Brief* at 7-9.  Second, he argues that the RFC found in the administrative decision did not account for the full degree of mental limitation.  *Id.* at 9-11.  Third, as to the physical limitations, Plaintiff contends, in effect, that the ALJ "cherry pick[ed] the better office notes" to support the RFC for light work.  *Id.* at 11-13.  In his fourth argument, he notes that the medical transcript does not contain a consultative mental examination, arguing that upon remand, the ALJ should order a consultative examination.  *Id.* at 13-15.  Fifth, he contends that the transcript is "devoid of any RFC assessments" by psychiatrists or physicians, and thus, the RFC crafted by the ALJ is unsupported by substantial evidence.  *Id.* at 15-16.  Finally, Plaintiff argues that the ALJ's rationale for the physical RFC "does not contain any rationale or reference to the supporting evidence.  *Id.* at 16-17.

Plaintiff's second and fourth arguments, both pertaining to the ALJ's evaluation of the mental limitations, can be considered in tandem.  Likewise, arguments three and six, which both assign error to the evaluation of the physical limitations can be considered together.

### A.  The VA Disability Determination (Argument 1)

Plaintiff argues that the ALJ erred by failing to adopt the VA finding of 100 percent disability.  However, because the standards used by the VA are different than those used by the SSA, a VA's disability determination is not binding on the SSA.  *See* 20 C.F.R. § 404.1504 (disability determination, made by another governmental agency based on its own rules, not

---

[6] HALLEX II-1-11-12, cited by Plaintiff, was removed in 2005.  Nonetheless, the Court will address his argument that the ALJ did not give due consideration to the VA's disability determination.

binding on the SSA); SSR 06–03p, 2006 WL 2329939, *7 (August 9, 2006)("because other agencies may apply different rules and standards . . . for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency").  The VA disability rating is "only one factor to be considered in making a social security disability finding." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 512 (6th Cir. October 4, 2013).  Nonetheless, the SSA must consider the other agency finding when making its own disability determination. A disability finding by another agency "cannot be ignored and must be considered." SSR 06–03p at *7.

Plaintiff's argument that the ALJ failed to accord "proper" weight, or, did not provide a rationale for declining to adopt the VA disability finding is not well taken.  The ALJ noted that Plaintiff was "100 percent service-connected disability rated through the [VA], and this has been considered in accordance with the regulations" (Tr. 28).  The ALJ went on to point out that the VA "operates under entirely different standards and definitions concerning 'disability,' a term of art in these proceedings"  (Tr. 28).  He correctly noted that the VA's determination was "by no means dispositive" of the SSA's disability determination (Tr. 28). While Plaintiff argues these findings were conclusory, in fact, the ALJ prefaced them with a seven-page discussion of the VA treating records, Plaintiff's regular activities and college attendance, and the hearing testimony undermining the allegations of disability under SSA criteria (Tr. 22-28).  Because as in *Ritchie, supra,* the ALJ both acknowledged the VA's 100 percent disability determination and provided ample reasons for declining to accord it

controlling weight, the administrative findings on this point should remain undisturbed. *Id.* at 511-512 (ALJ's rejection of a VA 100 percent disability rating upheld where supported by detailed analysis of the claimant's "medical and psychological condition, the opinions of [the] current treating physicians, [] work history and [] daily living habits").

## B.  The Mental Limitations (Arguments Two and Four)

Plaintiff contends, in effect, that the conclusion that he possessed the concentrational abilities to perform competitive employment is not supported by the transcript. *Plaintiff's Brief* at 10; SSR 96-8p.

In crafting the RFC, the mental as well as physical limitations "must be expressed in terms of work- related functions."  SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996). "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.*

Contrary to Plaintiff's second and fourth arguments, the RFC composed by the ALJ addresses the factors set forth in SSR 96-8p.  The ALJ addressed Plaintiff's limitations in judgment, ability to handle stress, and difficulties interacting with others by restricting him to "a low stress job, defined as a job calling for no more than occasional decision-making and no more than occasional changes in the work setting; limited to no more than brief superficial interaction with the public and coworkers; and no more than occasional supervision" (Tr. 20).

While Plaintiff also argues that he experiences greater than "moderate" concentrational limitations, the ALJ noted the finding of moderate deficiency in concentration, persistence, or pace (Tr. 19) was directly drawn from Dr. Moten's March, 2013 non-examining finding of the same (Tr. 27, 84-84).  As further noted by the ALJ, the treating records that Dr. Moten relied upon in making her findings also support the finding that Plaintiff did not experience more than moderate limitation.  The ALJ cited Plaintiff's ability to attend college and work part-time after the alleged onset of disability (Tr. 24). He noted that the psychological symptoms subsided when Plaintiff complied with his psychotropic medication regimen, citing treating records showing that he appeared "alert and attentive, fully oriented, with cooperative and reasonable appearance and behavior" (Tr. 25-26).  He cited notes stating that Plaintiff was "quite happy" with his current medication which kept "his mood up and his temper down" (Tr. 26).  The ALJ noted that Plaintiff engaged in a wide variety of activities and was able to interact with others on at least a superficial basis (Tr. 27).

Plaintiff also relies on 20 C.F.R. § 404.1503(e) in support of the argument that he is entitled to a remand for a consultative psychological examination. *Plaintiff's Brief* at 13. This argument reflects an erroneous interpretation of the regulation, which states,  "An initial determination by a State agency or the Social Security Administration that you are not disabled . . . in any case where there is evidence which indicates the existence of a mental impairment, will be made only after every reasonable effort has been made to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review

-20-

and any applicable residual functional capacity assessment." In fact, Dr. Moten, psychologist, performed such a review in March, 2013. Plaintiff's belief that he is also entitled to a consultative examination is wholly unsupported by the regulation. *See Arroyo v. Comissioner of Social Security,* 2016 WL 424939, *3 (E.D.Mich February 4, 2016)(Michelson, J.)(claimant's belief that she was entitled to a consultative examination "rests on a misunderstanding of § 404.1503(e)").

Because the ALJ's findings as to the mental limitations are well supported and articulated, a remand on this basis is not warranted.

### C. The Physical Limitations (Arguments Three and Six)

As to the alleged physical limitations, Plaintiff relies again on SSR 96-8p, this time arguing that the ALJ failed to perform a "function-by function" assessment of the physical as required by the ruling. *Plaintiff's Brief* at 11. Plaintiff later argues more generally that the ALJ failed to comply with the ruling's requirement of "narrative discussion" in support of the RFC. *Id.* at 16.

Under SSR 96–8p, the ALJ's RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at *7. The analysis of the physical functions must include the exertional activities of "sitting, standing, walking, lifting, carrying, pushing, [and] pulling" as well as the non-exertional limitations. 20 C.F.R. § 404.1545. However, " '[a]lthough a function-by-function analysis

-21-

is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v. Commissioner of Social Sec.*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS*, 251 F.3d 153, slip op. at 4 (Table)(3rd Cir. December 19, 2000)(punctuation added). "'[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. 5).

Contrary to Plaintiff's argument, the ALJ complied with the requirements of SSR 96-8p.  He supported the RFC for a limited range of exertionally light work by noting that Plaintiff's treatment had been conservative, despite the availability of affordable care through the VA (Tr. 22).  The ALJ noted that Plaintiff's joint pain was improved with injections (Tr. 22).  He cited the treating records showing a normal gait and the lack of swelling or other "abnormalities of the extremities" (Tr. 22).  He cited later records showing full strength in the upper extremities with the exception of "the right triceps, hand and grip which were slightly weaker" (Tr. 22).  However, the ALJ noted that Plaintiff achieved greater right upper extremity strength through physical therapy (Tr. 22).  Despite some limitations in neck motion, the ALJ noted that Plaintiff exhibited normal muscle tone (Tr. 23).  While Plaintiff contends that the ALJ "cherry pick[ed] the better office notes" to support the non-disability finding, the ALJ's conclusions (consistent with my own review of the medical transcript) suggests that if anything, the RFC understates Plaintiff's actual physical abilities.

-22-

Likewise, while in his sixth argument, Plaintiff briefly revisits his contention that the ALJ failed to provide a rationale for the mental limitations found in the RFC, *Plaintiff's Brief* at 17, the ALJ noted that Plaintiff's mental treatment had been conservative, the treating records showed appropriate behavior, and that Plaintiff responded well to psychotropic medication (Tr. 24).   As such, the ALJ did not err in concluding that Plaintiff was capable of a limited range of exertionally light, unskilled work.

### D.  Evidence Supporting the RFC (Argument 5)

Plaintiff again takes issue with the RFC, arguing that "the record is devoid of any RFC assessments from any psychiatrist or physicians whatsoever." *Plaintiff's Brief* at 15-16.  First, as discussed above, the ALJ did not err in adopting Dr. Moten's March, 2013 non-examining assessment.  "In appropriate circumstances," the opinion of non-examining source "may be entitled to greater weight than the opinions of treating or examining sources."   SSR 96–6p, 1996 WL 374180, *3. (July 2, 1996); *Brooks v. Comm'r of Soc. Sec.,* 531 Fed.Appx. 636, 642 (6th Cir. August 6, 2013)(same).  Plaintiff does not explain how the ALJ erred in adopting Dr. Moten's findings and my own review of the treating records indicates that the ALJ's inclusion of some of the alleged mental limitations and (exclusion of others) is generously supported.

As discussed above, the RFC for a limited range of exertionally light work is also supported by the treating records showing that Plaintiff exhibited a normal gait, good muscle tone, and that conservative treatment was effective in relieving his shoulder and knee conditions.  Plaintiff's ability to perform self-care activities and engage in variety of activities

-23-

such as shopping, fixing cars, and attending church also supports the light work finding.  An ALJ may consider "household and social activities engaged in by the claimant" in determining his functional abilities.  *Walters v. CSS*, 127 F.3d 525, 532 (6ᵗʰ Cir. 1997); *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 542 (6th Cir. 2007)(same).

In closing, my recommendation to uphold the ALJ's findings should not be read to trivialize Plaintiff's physical and mental conditions.  Nonetheless, the determination that the Plaintiff was not disabled  is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

### CONCLUSION

For these reasons, I recommend that Defendant's motion for summary judgment [Doc. #18] be  GRANTED and that Plaintiff's motion for summary judgment [Doc. #15] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6ᵗʰ Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6ᵗʰ Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and

Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: January 31, 2017


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 31, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager

-25-